JiMURRAY, Judge.
Mr. Samuel Keelen appeals his conviction of cruelty to a juvenile, a violation of La.Rev. StatiAnn. § 14:93, for which he has been sentenced as a second felony offender to serve fifteen years at hard labor. He argues that the trial counsel’s failure to prevent the admission of hearsay testimony resulted in a conviction that is otherwise unsupported by the evidence, and that his counsel was ineffective.

FACTS

The State’s evidence established that She-lita Palmer, a two-year-old, suffered severe bums when her feet were placed into scalding hot water and held there for at least one minute during the evening of September 30, 1992.
Dr. William Loe, an expert in the field of pediatric surgery and bum care, testified that Shelita’s deep partial thickness bums had characteristic “stocking” marks indicating that both feet had been dipped in hot water or that she had been forced to stand in the water. In his opinion, it was virtually impossible for these hbums to be the result of an accident. Additionally, Shelita had significant bruising on the left side of her face and her left eye was partially closed by swelling, as though she had been struck in the face.
Detective Generio Sanders testified that after interviewing the victim’s mother and older sister, a photographic line-up was presented to the mother, who identified Mr. Keelen as her children’s caretaker that evening. An arrest warrant was issued, and Mr. Keelen was taken into custody about two weeks later. When recalled during the state’s rebuttal, Detective Sanders added that Mr. Keelen had been seen in the courtyard of Shelita’s residence at about 9:10 p.m. when Shelita’s mother, Ms. Shelita Palmer, returned from an errand.
Out of the presence of the jury, the victim’s four-year-old sister, Jennifer, was found to be a competent witness. Then, over the defense’s objection, she hesitantly and reluctantly testified that her sister Shelita’s feet had been burned in hot water in the tub and that “Sammy” did it. However, when Mr. Keelen was pointed out in the courtroom and Jennifer was asked if that was “Sammy,” she only shrugged her shoulders. On cross-examination, Jennifer affirmed that both “Sammy” and her mother had been with the children that night; that her mother had gone someplace, then Shelita’s feet had been burned; and that “Sammy” had done it.
Derrick Banks, Mr. Keelen’s lifelong friend, testified that the two of them had spent the entire evening, roughly from 7:00 p.m. to midnight, at a club. Although Mr. Banks remembered being with Mr. Keelen on that date, he could not remember anything unusual about the evening that would make it stand out in his memory.
hMr. Keelen testified that Ms. Shelita Palmer was his girlfriend, and admitted he had been at her apartment before he went out with Mr. Banks. However, he denied being in her home during the evening hours. He stated that he was out drinking at the Dryades Street “Club 2001” around 7:30 or 8:00 p.m. and left it around midnight. He first learned of little Shelita’s injuries when he returned to his mother’s apartment from the club, but did not learn that the police were looking for him until he spoke to Ms. Palmer the next day. Mr. Keelen denied either taking care of the children or disciplining them at any time. He explained that he and Ms. Palmer were still in a relationship and that she recently visited him in jail.

ARGUMENT

A review of the record reveals no errors patent.
Mr. Keelen’s only assignment of error is that he was denied due process of law because he received ineffective assistance of counsel. Specifically, Mr. Keelen asserts that his attorney’s failure to make an opening statement and to prevent the admission of hearsay testimony requires reversal of his conviction.
Although a claim of ineffective assistance of counsel is normally raised in an *581 application for post-conviction relief, this Court may address the merits of the claim when the record on appeal is sufficient. State v. Seiss, 428 So.2d 444 (La.1983); State v. Dorsey, 94-2142 (La.App. 4th Cir. 9/28/95), 662 So.2d 156. In this instance the record is sufficient, and Mr. Keelen’s entire appeal is based upon the ineffective assistance of counsel claim.
Mr. Keelen first argues that his appointed counsel committed reversible error by failing to make an opening statement. He asserts that it was crucial for counsel to make an opening statement because the subject matter of the case, cruelty to a | juvenile, is highly emotional and the jury would be unduly influenced by the testimony of a four-year-old child. Mr. Keelen also argues that it was crucial for his attorney to mention during his opening statement that Mr. Keel-en had an alibi witness who would testify that Mr. Keelen was someplace else on the night of the crime.
Defense counsel is not obligated to make an opening statement in a non-capital case. La.Code Crim.Proc.Ann. art. 765. In order to prevail on a claim of ineffective assistance of counsel, the defendant must show that the failure of trial counsel to make an opening statement resulted in specific prejudice. State v. Smith, 94-0621 (La.App. 4th Cir. 12/15/94), 647 So.2d 1321; State v. Cheatham, 519 So.2d 188 (La.App. 4th Cir.1987), writ denied, 523 So.2d 228 (La.1988). If an alleged error results from a reasonable strategic decision, it does not establish ineffective assistance of counsel. State v. Brooks, 94-2438 (La.1995), 661 So.2d 1333. Moreover, as “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Brooks, 505 So.2d 714, 724 (La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
In the case at bar, the jurors at the conclusion of the voir dire were well aware that the case involved cruelty to a juvenile and that the State intended to present a child as its main witness. In its opening statement, the State discussed the manner in which the child might testify, asking the jurors to hear her out. In closing argument, Mr. Keelen’s counsel noted that a small child could be coached into testifying a certain way and pointed out that Jennifer could repeat the word |5“Sammy” but did not say that Mr. Keelen was “Sammy.” Therefore, no prejudice resulted from counsel’s failure to address these issues in an opening statement.
Mr. Keelen’s argument concerning the importance of establishing his alibi in an opening statement is equally without merit. Mr. Banks was not the most credible of witnesses, so it is plausible that counsel did not want to set up the alibi defense as its sole strategy before the taking of testimony had commenced. Both Mr. Keelen and his friend testified as to Mr. Keelen’s whereabouts on the night of the incident. The jury apparently was not impressed with Mr. Banks’ testimony that he remembered being with Mr. Keelen on the night of the crime, partying as they usually did, but that he could not remember anything special about the evening other than to say the temperature was “pretty cool.” Additionally, Mr. Keelen’s counsel later attempted to cast suspicion on Shelita’s mother as the culprit, both through testimony and in his closing argument. Therefore, it cannot be reasonably concluded that counsel’s failure to make an opening statement was not trial strategy, nor that Mr. Keelen was prejudiced by this failure.
In the second prong of his assignment of error, Mr. Keelen first argues that his trial counsel not only failed to make timely objections to Detective Sanders’ hearsay testimony, but even elicited such evidence.
Hearsay testimony is “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” La.Code Evid.Ann. art. 801 C. Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. La.Code EvidAnn. art. 802.
Mr. Keelen first complains of the hearsay testimony elicited by the State from Detec- *582 tíve Sanders, the investigating officer, during direct examination:
|f,Q: What did you do as a result of meeting with Shelita Butler (sic) and learning of her injuries?
A: After learning of her injuries, we interviewed the older sibling and we also interviewed the mother. Through talking to them, we had learned that the child had been left in the care—
Defense Counsel: I’m going to object.
COURT: Objection sustained.
Q: As a result of the interviews with the mother, what did you do?
A: As a result of the interviews with the mother, we proceeded to the mother’s residence. Upon arriving there, we requested a crime lab unit, again and they took photographs of the residence. We also attempted to locate the baby’s caretaker that evening, Mr. Keelen but those results met — those attempts met with negative results.
Q: As a result of your investigation, did you have an occasion to prepare an arrest warrant?
A: Yes, I did. We — my partner, Detective Guy put together a photo line-up and brought the line-up to the mother of the child. She identified Mr. Keel-en as the person who was the caretaker on this particular evening and we subsequently put out an arrest warrant for Mr. Keelen. We were later notified approximately two weeks later that sixth district officer Gros and his partner had located Mr. Keelen who they knew and had seen in the area and they subsequently arrested him.
In State v. Watson, 449 So.2d 1321, 1328 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985), the Louisiana Supreme Court stated:
A witness is generally competent to testify that a statement was made to him so long as no attempt is made to vouch for the credibility of its contents. State v. Ford, 368 So.2d 1074 (La.1979); State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). A police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case. Such statements are admitted not to prove the truth of the assertion, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the investigating officer. State v. Calloway, 324 So.2d 801 (La.1976); State v. Smith, 400 So.2d 587 (La.1981); State v. Edwards, supra.
In State v. Williams, 591 So.2d 404 (La.App. 4th Cir.1991), this Court held that a police officer’s testimony as to what he had been told by third parties ^regarding a robbery was not inadmissible hearsay, where the testimony was purely introductory and explanatory as to why, where and how he pursued and subsequently arrested defendant.
While Detective Sander’s testimony may have ceased to be “purely introductory and explanatory” at some point during direct examination, the defense’s failure to continually object does not constitute reversible error. Counsel objected at the first reference to what the victim’s mother might have told the detective about Mr. Keelen but failed to again object when the same line of questioning was resumed.
Additionally, defense counsel’s cross-examination of Detective Sanders, of which Mr. Keelen complains, suggests the failure to object to hearsay and the deliberate extraction of such testimony was strategic. The following exchange occurred:
Q: Now, at that point in time, did you talk to this sibling about what had happened?
A: I talked to the sibling at the hospital.
Q: Did she give you any information that you worked up?
A: Yes, she did.
Q: Did the mother give you any information? Did she tell you when this individual, if he was in that apartment, earlier and she—
COURT: Wait. Mr. Dolan, he can’t testify to what she told him. You just objected to the same thing.
*583 Q: Did you, in your investigation, pinpoint the time that the mother had left the apartment to go wherever she went? A: Yes, I did.
Q: What time was that, about?
A: That was approximately 8:50 on that evening.
|8Q: Did you determine or did you determine from your investigation what time she arrived back at that particular apartment?
A: Yes, I did.
Q: What time was that?
A: That was approximately 9:10 that evening.
Q: And at that point, I assume that she went ahead and stated that she found the younger child in the condition she was in, is that correct?
A: Upon returning home—
COURT: Mr. Dolan, you’re asking for more hearsay. Out of necessity, he is going to have to wander.
Defense counsel: All right, strike that question. We won’t go into it. I have nothing further of this witness.
Mr. Keelen contends defense counsel’s ineffectiveness continued when the State recalled Detective Sanders on rebuttal:
Q: Detective Sanders, on the night in question, do you remember talking to the mother, Shelita?
A: Yes, I did.
Q: That would be Shelita Palmer.
A: That’s correct.
Q: And through that, did you develop any information as to where the defendant was?
A: Yes, I did.
Q: And where was that?
A: He had been seen down in the courtyard when Ms. Palmer returned.
Q: About what time was that?
A: Approximately 9:10.
State: No further questions.
Defense counsel: How could you verify the time?
laA: She said that it was after she—
Defense counsel: Objection to hearsay.
COURT: You asked him, Jack.
Defense counsel: I’m saying, he popped it out before.
State: He asked the question, your honor.
COURT: I know but you asked a question that you got away with. All right, Mr. Dolan.
Defense counsel: I have nothing further.
COURT: No, ask him. I mean, he got away with hearsay.
Defense counsel: All right. Who did you get the information from?
A: I got the information from the mother.
Q: The mother?
A: Yes.
As evidenced in the closing argument, defense counsel attempted to place the blame for Shelita’s injuries on her mother. Consequently, he needed to pinpoint the time period during which the alleged incident was supposed to have occurred and to expose to the jury Ms. Palmer’s statements to the officer without calling her as a witness.[1] This time-frame was necessary both to set up Mr. Keelen’s alibi defense and, more importantly, to cast suspicion on Ms. Palmer’s actions that evening, including her quick and easy implication of the defendant as the perpetrator of the abuse.
_JioIn this light, defense counsel’s decision to refrain from objecting to hearsay testimony from Detective Sanders, and even to elicit such evidence, appears to have been strategic rather than merely erroneous. Additionally, counsel was allowed to expose the source of the hearsay, the victim’s mother, which helped to reduce the negative effect of the *584 improperly admitted evidence. As noted above, counsel vigorously argued in closing that Ms. Palmer was more likely the cause of Shelita’s injuries. He emphasized that the State’s failure to call Ms. Palmer, the out-of-court accuser, should raise doubt in the juror’s minds as to Mr. Keelen’s involvement in the abuse of the victim. That defense counsel’s strategy did not ultimately produce an acquittal does not by itself render his assistance defective under the Sixth Amendment.
Mr. Keelen also contends that his trial counsel erred in not objecting when the State attempted to impeach him on cross-examination through the use of hearsay and double-hearsay, particularly since the State knew that the declarant, Shelita’s mother, was unavailable to testify. He argues that, at the least, a limiting instruction as to the impeaching purpose of the evidence should have been requested.
During defense counsel’s direct examination of Mr. Keelen, he denied being at Ms. Palmer’s residence during the evening Sheli-ta was injured. On cross-examination, the prosecutor questioned Mr. Keelen as follows:
Q: Isn’t it true, Mr. Keelen, on that evening you were at her residence and that she left to go buy cigarettes?
A: No.
Q: And upon her return, you were found to have left the apartment to be involved in a dice game on the block?
A: No.
InQ: And that your concern for her children was, “Well, I’ll offer you cab fare to get them to the hospital?”
A: (Negative response)
Since these questions are not evidence, they cannot be considered hearsay testimony and counsel could not have objected to the questions on hearsay grounds. Nor was there a need for a limiting instruction as to the purpose of the hearsay, because no such evidence was introduced by means of the State’s questions.
In the third prong of his assignment of error, Mr. Keelen argues that defense counsel was more successful than the State at eliciting evidence unfavorable to him from Jennifer, the child witness. He asserts that Jennifer never specifically identified him on direct examination as the “Sammy” who had burned her sister’s feet; not until cross-examination, Mr. Keelen contends, did the witness link the “Sammy” who had been staying with her mother as the person who had harmed her sister.
The defendant’s assertions are not entirely correct, because even on cross-examination, Jennifer did not specifically identify Mr. Keelen as the “Sammy” who had burned her sister’s feet. The transcript reveals that the child became hesitant and uncommunicative on direct examination when she was asked whether “Sammy” was in the courtroom and to point him out. She also could not say whether “Sammy” had been living with her and her sister at the time of the incident. However, she did testify on direct that she saw “Sammy” bum Shelita’s feet with hot water in the bathtub. On cross-examination, the child affirmed that her mother had been home that evening, that “Sammy” had been at the home, that her mother and “Sammy” had been together with the children, that her mother hadJjjleft the apartment to go someplace, and that her sister’s feet were then burned by “Sammy.”[2]
Defense counsel also questioned Jennifer as to who had spoken to her about the incident, how many people had done so, and when she had spoken to them. At one point, the child answered that two people had talked with her about Shelita’s injury. When she could not provide any further information, defense counsel ceased questioning.
*585 These questions by the defense attorney were clearly not designed to inculpate Mr. Keelen. True, the exchange emphasized Jennifer’s story and introduced non-hearsay testimony that Ms. Palmer and “Sammy” had been together that evening and that her mother had left the apartment before the incident occurred. Still, it is certainly plausible that counsel through his questions was attempting to place the mother on the scene and to determine if she had left the apartment that evening. These questions proposed two defense theories which were asserted in counsel’s closing argument: that Ms. Palmer might have “lost her cool” and injured the child or that she could have negligently left the children alone and an accident had occurred as a result of a defective faucet.
We thus conclude that most of defense counsel’s actions were reasonably related to a viable defense strategy, although the attorney could have made better and more timely objections to the hearsay evidence introduced by the State. Yet, even if it is assumed that counsel’s performance was below a reasonable standard, | isthe Court must determine whether the deficient performance resulted in prejudice to the defendant. As previously noted, Mr. Keelen argues that, but for his counsel’s errors, the State’s evidence would have been insufficient to support the verdict returned by the jury.
When assessing the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La.Rev.Stat.Ann. § 15:438. This statutory provision is not a separate test from Jackson, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d at 820.
Cruelty to a juvenile is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to the child. La.Rev.Stat.Ann. § 14:93 A.
|i4In this case, the properly-admitted evidence satisfies the Jackson standard. Even without the complained-of hearsay, the State properly introduced the testimony of the victim’s sister who stated that she had seen “Sammy” bum Shelita’s feet with hot water in the bath tub. The State’s expert witness testified that the child’s injuries were intentionally inflicted and could not reasonably have been the result of an accident. Although Jennifer did not specifically identify Mr. Keelen as the “Sammy” who had injured her sister, the defendant admitted that he and the victim’s mother had an ongoing relationship at the time of the offense. In the face of this evidence, Mr. Keelen’s alibi defense, bolstered only by the rather questionable testimony of Derrick Banks, cannot be characterized as strong. In sum, the evidence, though circumstantial, was sufficient to exclude all other reasonable hypotheses of innocence, including theories that the mother had abused the victim or that the victim had been injured in an accident.
For these reasons, Mr. Keelen’s conviction is affirmed.
AFFIRMED.

. Ms. Palmer was not called as a witness by either side. The State presumably did not want her to testify because she was still romantically involved with Mr. Keelen and may have been hostile to its objective of convicting him. Instead, the State presented as its primary witness the victim's sister Jennifer, who was now in the custody of her father and no longer exclusively dependent upon her mother. Mr. Keelen presumably did not need Ms. Palmer to testify because he wanted to place the blame for the abuse on her without permitting the State to elicit on cross-examination her denial of any involvement in the incident.

. At one point, defense counsel asked the witness, "Now, did you see this man, Sammy at your house the night your sister got hurt?” Jennifer responded in die affirmative. From the context of the exchange, it is clear that counsel's reference to “this man, Sammy” was not intended to direct the child's attention to Mr. Keelen for the purpose of identifying him as "Sammy.” Rather, counsel was apparently attempting to ascertain the mother’s whereabouts during the night of the incident. Notably, Jennifer was not specifically asked by either side whether her mother had been home at the time of the incident or whether her mother had participated in it.