STATE OF LOUISIANA      *      NO. 2024-KA-0751

VERSUS      *

           COURT OF APPEAL

ALICIA WHITE      *

           FOURTH CIRCUIT

     *

           STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 548-979, SECTION "F"
Honorable Robin D. Pittman, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *
(Court composed of Judge Joy Cossich Lobrano, Judge Tiffany Gautier Chase,
Judge Dale N. Atkins)

**LOBRANO, J., CONCURS IN THE RESULT**

Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158


       COUNSEL FOR APPELLANT, Alicia White

Jason R. Williams, District Attorney
Brad Scott, Chief of Appeals
Thomas Frederick, Assistant District Attorney
PARISH OF ORLEANS
619 South White Street
New Orleans, LA 70119


       COUNSEL FOR APPELLEE, the State of Louisiana

**AFFIRMED
NOVEMBER 7, 2025**

*DNA*

*TGC*

This is a criminal case. Appellant, Alicia White ("Ms. White"), appeals her conviction and sentence for negligent homicide. Appellee is the State of Louisiana ("State"). For the following reasons, we affirm Ms. White's conviction and sentence.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The State first initiated proceedings against Ms. White on April 26, 2016, in Orleans Parish Traffic Court in connection with an accident that occurred on April 24, 2016 ("traffic court proceedings"). Specifically, the State charged Ms. White with operating a vehicle while impaired with a blood-alcohol content of 0.165 percent in violation of La. R.S. 14:98; reckless operation of a vehicle in violation of La. R.S. 14:99; operating a vehicle with a suspended license in violation of La. R.S. 32:415; and driving while intoxicated, first offense, in violation of La. R.S. 14:98.1(A)(1). As a result of injuries he sustained in said accident, Zachary Scott ("Mr. Scott") subsequently passed away on August 11, 2017. As to the traffic court proceedings, on November 11, 2017, Ms. White pled guilty to operating under the influence in violation of La. R.S. 14:98 and, in doing so, entered into a plea

1

agreement with the State whereby the State dismissed the other charges against her.

Thereafter, on June 25, 2020, in the Orleans Parish Criminal District Court, the State filed a Bill of Information which charged Ms. White with one count of vehicular homicide of Mr. Scott in violation of La. R.S. 14:32.1. On January 1, 2021, Ms. White appeared for arraignment where she pled not guilty to the charge. On November 22, 2022, Ms. White filed a Motion to Quash Bill of Information ("First Motion to Quash"). Therein, Ms. White asserted the State's prosecution against her for vehicular homicide violated the principles of double jeopardy and collateral estoppel because of the plea agreement in the traffic court proceedings. The same day she filed her First Motion to Quash, Ms. White also filed a Motion for a Twelve-Person Jury. Then, on December 8, 2022, the district court denied both Ms. White's First Motion to Quash and her Motion for a Twelve-Person Jury.

Subsequently, in April 2024, Ms. White filed a Second Motion to Quash Bill of Information ("Second Motion to Quash"). In her Second Motion to Quash, Ms. White asserted her right to due process and right to a speedy trial had been violated by delays in both the institution of the prosecution against her and the commencement of her trial. On April 26, 2024, the district court denied her Second Motion to Quash.[1]

---

[1] We note the file date stamped on Ms. White's Second Motion to Quash is April 28, 2024, yet the record reflects the district court ruled on the motion prior to that date, specifically on April 26, 2024. The index of the minute entries for Ms. White's case includes an April 28, 2024 entry, which stated:

> MOTION TO QUASH BILL OF INFORMATION      04/28/24
> **** DATE OUT OF SEQUENCE*****

Based on the record, we know Ms. White filed her Second Motion to Quash sometime in April 2024, specifically before April 26, 2024, when the district court ruled on it.

Ultimately, the matter proceeded to a jury trial, which began on April 29, 2024, and ended on May 1, 2024.

## Summary of Trial Testimony

At trial, in pertinent part, the State presented the testimony of Sergeant Travis T. Johnson ("Sergeant Johnson"), Dr. Amanda Krausert ("Dr. Krausert"), Detective Danny Ellis ("Detective Ellis"), Detective Michael Baldassaro ("Detective Baldassaro"), and Clifford Sherlock ("Mr. Sherlock"). The defense presented the testimony of Officer Michael Sartain ("Officer Sartain"), Ronald Evans ("Mr. Evans"), Sundiata Haley ("Mr. Haley"), and Ms. White. Each witness' testimony is summarized in turn.[2]

### Sergeant Johnson's Testimony

The State called Sergeant Johnson as its first witness, and he testified that at the time the accident occurred he was a new officer for the New Orleans Police Department ("NOPD"), only "out of the academy for about six months." Sergeant Johnson explained that on the morning of the accident, he was dispatched to I-10 West, "between [the] I-10 West Morrison entrance ramp and the Chef exit ramp I-10 West." Sergeant Johnson stated that, upon his arrival, he was directed by witnesses on the scene to an injured person in the backyard of a house on Francis Street, adjacent to the interstate. Using a diagram of the accident, which he had included in his accident report, Sergeant Johnson explained that, after leaving the roadway, a vehicle traveled through multiple fences and the backyards of five houses before hitting a pole and coming to a stop. According to Sergeant Johnson,

_____

[2] Four additional witnesses testified in this matter, but their testimony is not relevant to this appeal.

the victim of the accident, Mr. Scott, was in the backyard of the fourth house in "the flight path . . . of the vehicle."

Sergeant Johnson testified that this was the first "DUI" incident he ever handled because he was a new officer at the time.[3] When asked whether he was the one "that ultimately made the decision to treat this as a DUI," Sergeant Johnson responded, "No, ma'am, it was not me." Sergeant Johnson further explained that, at the time of the accident, he did not yet have the on-the-job experience to recognize the signs that someone is "under the influence or intoxicated," such as "not willing to listen" and "being all over the place." After explaining that he had since gained such experience and after viewing portions of his body worn camera footage from responding to the subject accident, Sergeant Johnson testified that he observed those characteristics in the driver responsible for the subject accident. Testifying about his response to the accident, Sergeant Johnson stated that after securing the scene and ensuring that anyone who needed medical care received it, he obtained approval from his supervisor to proceed with the DUI processing of the driver of the vehicle identified as being responsible for the accident, Ms. White. Nonetheless, Sergeant Johnson's accident report listed Ms. White's condition as "unknown." Sergeant Johnson explained that he listed Ms. White's condition as "unknown" because he was not the officer who ultimately conducted the DUI testing on her. Thus, as further explained by Sergeant Johnson, even if he had believed Ms. White was intoxicated, he did not have proof of her intoxication while he was on the scene. Sergeant Johnson testified that another officer took

---

[3] In their testimony, the parties and witnesses used "DUI" and "DWI" interchangeably to refer to the crime of "operating a vehicle while impaired" as prohibited by La. R.S. 14:98. For the sake of consistency and clarity in this opinion, we use "DUI" exclusively to refer to the aforementioned crime.

custody of Ms. White and relocated her for DUI testing while he remained on the scene to talk to witnesses, take statements, and have Ms. White's vehicle towed.

Sergeant Johnson clarified that Ms. White's car did not actually hit Mr. Scott, although he stated that Ms. White was the cause of Mr. Scott's injuries. Sergeant Johnson specified that, as noted in his accident report, the accident involved only Ms. White's car and resulted from her "drunk" and "erratic[]" driving, which caused her to lose control of her vehicle. When asked how he learned about Mr. Scott's location at the time of the accident, defense counsel objected, stating that the question called for hearsay, but the district court overruled the objection. Sergeant Johnson testified that, at the time of the accident, Mr. Scott was standing on a set of stairs attached to a residence that led to a second floor balcony, and Ms. White "indirectly" hit Mr. Scott because she crashed into the stairs, thereby causing Mr. Scott to fall from the second story.

Sergeant Johnson also testified that he spoke with several witnesses on the scene, who filled out voluntary witness statements. Counsel for the State then questioned Sergeant Johnson about the witnesses he spoke to on the scene, specifically a witness named Joshua Mulvaney ("Mr. Mulvaney"). Defense counsel objected on the basis that testimony regarding the statement of a non-testifying witness constituted hearsay and a violation of the confrontation clause. The district court sustained the objection but allowed the State to rephrase its questions to allow Sergeant Johnson to testify regarding the course of his investigation. Sergeant Johnson testified that on the scene, he learned that Mr. Mulvaney observed Ms. White "driving erratically at a high rate of speed" and "cutting in and out of traffic."

5

### Dr. Krausert's Testimony

As its second witness, the State called Dr. Krausert, a certified forensic pathologist, and the district court declared Dr. Krausert an expert in the field of forensic pathology. Dr. Krausert explained that she was assigned to conduct Mr. Scott's autopsy, at which time she learned the circumstances of his case. Dr. Krausert testified that Mr. Scott suffered "remote" traumatic injuries from the accident which had since healed and that he had been living in a nursing home as a consequence of those injuries at the time he died. Dr. Krausert noted that Mr. Scott sustained traumatic brain injuries during the accident,[4] and she answered affirmatively when asked whether there was "a direct correlation between his brain injury and his ultimate death." Specifically, Dr. Krausert explained that Mr. Scott's traumatic brain injuries led to Mr. Scott suffering from "dysphasia, which is a medical term for difficulty swallowing." Dr. Krausert stated that Mr. Scott ultimately died from "aspiration pneumonia," which resulted from "his impaired swallowing, due to his brain injury" sustained during the accident.

Dr. Krausert further testified that, according to the medical records and coroner's report, prior to the accident, Mr. Scott led a normal life and was able to walk, talk, and function without deficit, but that after the accident he was confined to bed at all times except for brief periods of time when he tried to do physical therapy.[5] Dr. Krausert testified that Mr. Scott had a history of "significant medical

---

[4] Dr. Krausert explained that remote traumatic brain injuries are detectable but cannot be dated, meaning they could be months, years, or decades old. However, Dr. Krausert noted that Mr. Scott did not have any acute, or recent and still healing, brain injuries.

[5] Mr. Scott's neighbor, Ms. JoAnn Davis ("Ms. Davis"), also testified on behalf of the State although her testimony is not summarized in this Opinion. Ms. Davis's testimony corroborated Dr. Krausert's assertion that Mr. Scott was ambulatory prior to the accident.

conditions," including hypertension (high blood pressure) and type two diabetes. However, when asked whether Mr. Scott's "underlying diseases were[] the cause of [his] death," Dr. Krausert responded, "No."

### Detective Ellis' Testimony

Next, the State called as a witness Detective Ellis who testified that his involvement in the accident began when he received a call that a vehicle struck a residence. Detective Ellis noted that when he arrived other officers on the scene told him that the vehicle hit a balcony on which someone was standing and that emergency services had transported that person to the hospital in critical condition. Detective Ellis testified that he observed Ms. White on the scene and described her as emotional and stated that he smelled alcohol on her breath when he was in close proximity to her immediately when he arrived. Because he suspected Ms. White was intoxicated, Detective Ellis explained that he advised the officers on the scene that she should be transported to the DUI traffic station for further investigation. Detective Ellis noted that he had been working as a traffic investigation officer for many years at that point, so he was familiar with DUIs. In addition to smelling alcohol on her breath, Detective Ellis testified that he asked Ms. White whether she had been drinking, to which she responded, "she [had not] drunk since . . . [she had] been on the scene," thereby indicating that she had been drinking "at some time that day." In fact, though he could not recall Ms. White's statement as to what time she had last consumed an alcoholic beverage, Defective Ellis clarified that Ms. White "did acknowledge that she . . . had drinks," and stated that he remembered her saying "I [have not] had a drink since being out here." Finally, Detective Ellis explained that his only part in the investigation was to transport Ms.

White to the "traffic station" where Detective Baldassaro conducted a field sobriety test and breathalyzer test.

***Detective Baldassaro's Testimony***

Detective Baldassaro testified that on April 24, 2016, the date of the subject accident, he worked for the NOPD Traffic Fatality Unity. According to Detective Baldassaro, he learned not only that a traffic accident had occurred but also that it involved an impaired driver being transported to the DUI office and resulted in serious injury. As further explained by Detective Baldassaro, upon Ms. White's arrival at the DUI Office, he noted she was calm but he detected "a strong to moderate odor of alcoholic beverage emitting from her breath," though he clarified it "was not a severe smell." Thereafter, according to Detective Baldassaro, Ms. White consented to taking a field sobriety test, whereupon he administered the horizontal gaze nystagmus ("HGN") test,[6] the walk and turn test,[7] and the one leg stand test.[8] Detective Baldassaro testified Ms. White passed the HGN and walk and turn tests but did not successfully perform the one leg stand test because she counted by twos instead of by ones as instructed. Such a deviation from the instructions, according to Detective Baldassaro, indicated a "[s]light impairment."

---

[6] Detective Baldassaro explained the HGN test "look[s] for an involuntary jerking of the eye."

[7] As described by Detective Baldassaro, the instructions given for the walk and turn test are: "We tell them to take nine steps, heel-to-toe, down the line. When they get to the ninth step, take a series of small steps in a little circle, comeback down the line, nine steps touching heel-to-toe."

[8] Detective Baldassaro delineated the instructions he provides to someone undergoing the one leg stand test as follows:

> I give the person [I am] testing the ability to pick whatever leg they think is the strongest one to stand on. So what that is, you stand on whatever leg you want to choose, raise your other foot six inches off the ground, and stare straight ahead and you count one thousand one, one thousand two, one thousand three, one thousand four, for approximately 30 seconds.

As explained by Detective Baldassaro, he then instructed Ms. White that she would have to provide a breath sample too. Detective Baldassaro explained that even without the indication from the field sobriety test that Ms. White was impaired, they most likely would have taken a breath sample because of the serious bodily injury sustained by Mr. Scott. Detective Baldassaro testified that after consenting to the test, "[Ms. White] provided a breath sample of 0.165," which he explained is more than "two times the legal limit" of 0.08 in Louisiana.

According to Detective Baldassaro, after he "got the test results," he "prepared the booking paperwork," whereby he "charged Ms. White with vehicular negligent injury against Mr. Scott." When counsel for the State noted Detective Baldassaro subsequently "upgraded [the charge] to [v]ehicular [h]omicide" and asked "what went into . . . that decision," Detective Baldassaro responded that he based the decision "on the alcohol reading . . . from the initial test, and the fact that Mr. Scott [ultimately] died as a result of the crash."[9] Detective Baldassaro noted an additional consideration to upgrade the charge was that he learned during his investigation that Ms. White drove in a reckless manner before the accident, including: driving at a high speed, weaving back and forth out of traffic lanes, and running off the road. Detective Baldassaro explained that he prepared a supplemental report after Mr. Scott's death reflecting that Mr. Scott passed away on August 11, 2017. In terms of the cause of death he included in his supplemental report, Detective Baldassaro explained he obtained that from the coroner's report, which he described as stating that Mr. Scott's death "was accidental" stemming from a "[m]otor vehicle" accident, and the result of "the injuries [Mr. Scott]

---

[9] Detective Baldassaro specified he upgraded the charge on August 14, 2017, when the Coroner's Office notified him that Mr. Scott "had succumbed to his injuries that [he] sustained at the time of the crash."

sustained from being knocked off the [balcony] and becoming unconscious when he landed on the ground."

On cross-examination, counsel for Ms. White questioned Detective Baldassaro about the "Uniform DUI Arrest Citation," he filled out regarding Ms. White. When counsel described it as a "very standardized form that you have to fill out the entirety of," Detective Baldassaro agreed with this description. As counsel reviewed the form Detective Baldassaro completed regarding Ms. White, he confirmed that he selected "slight" for her level of impairment (as opposed to extreme or obvious); "fair" concerning her speech (as opposed to stuttering or slurred); and "unsure" for her balance (as opposed to falling or swaying).

### Mr. Sherlock's Testimony

The State also called Mr. Sherlock as a witness, and he testified that on April 24, 2016, he and his wife were traveling along I-10 West towards the "Highrise" when Ms. White almost hit them. Mr. Sherlock testified that he and his wife witnessed Ms. White's accident:

> [W]e were coming around the turn heading for a little bridge that goes over Morrison heading toward the Highrise. This [dark SUV] was coming up. I seen [sic] it coming up the ramp, I just [did not] know how fast they were going. Next thing I know, [they are] on the side of us, going like this. Me, the car in front of me, the guy in this lane, we slammed on the brakes. And it just so happened that metal guard rail, before you hit the bridge, caught the car and flung it off into a telephone pole. Which it went through a backyard, three other yards, winded up in an empty lot.

Mr. Sherlock further explained that he could see the driver of the dark SUV was angry at the car in front of them and saw her "flip the bird" at the other driver while she attempted to merge. According to Mr. Sherlock, the driver of the dark SUV was driving on the shoulder, past the end of the on-ramp, when the guard rail "flung" her off the road, thereby preventing her from colliding with Mr. Sherlock's

10

vehicle. Mr. Sherlock explained that at that particular on-ramp on the interstate, at Morrison Road, there is very little space to merge after leaving the on-ramp and opined that the metal guard rail into which the driver ran was far beyond where she should have tried to merge, stating: "[s]he should have never been there." Mr. Sherlock also testified that both he and the car in front of him had to "swerve" towards the lane to their left to avoid being hit by the dark SUV before it left the roadway.

***Officer Michael Sartain's Testimony***

The defense called Officer Sartain as a witness, and he stated that on April 24, 2016, he was an officer for the NOPD, on which date he responded to two different accidents on I-10 West. Officer Sartain explained he did not stay on the scene of the first accident for very long because he left to attend to the second accident, which was "further up the interstate, a little further westbound." According to Officer Sartain, the second accident involved two cars one of which was a silver Mercedes "going 80 miles per hour" and "swerv[ing] to go around another vehicle." Counsel for the defense played some of Officer Sartain's body worn camera footage from the date of the accidents, during which he can be heard saying to himself, "this is a very, very, very bad spot." Officer Sartain clarified that he said this in reference "to the location of the vehicles" following the accident. Further clarifying, Officer Sartain explained, he and the drivers involved in the accident were "in a turn," such that "vehicles [on the interstate] could easily not see us, and [might] run into the back of us." Officer Sartain explained that he was not referring to the dangerousness of driving on that stretch of the interstate, but instead pointing out the danger in responding to the accident in that location.

### Mr. Ronald Evans' Testimony

Also, of note, the defense called as a witness the driver of one of the cars involved in the second accident to which Officer Sartain responded, Mr. Evans. As delineated by Officer Sartain during his testimony, Mr. Evans was involved in an accident on the same date, around the same time, and in the same area of the interstate as Ms. White's accident. When asked whether he remembered how fast he was driving prior to the accident, Mr. Evans testified that "I [was not] driving too fast. Th[at] day they had a game. Traffic was very, very congested." According to Mr. Evans, a car hit his vehicle from behind, and the driver of that vehicle had been going fast. Counsel for the State asked Mr. Evans whether he had been drinking the morning of the accident, to which he responded, "I [do not] drink at all, ma'am." When counsel for the State sought further clarification and asked whether drinking contributed to his accident, Mr. Evans responded, "No, ma'am."

### Mr. Sundiata Haley's Testimony

As its next witness, the defense called Mr. Haley who represented Ms. White during her municipal and traffic court proceedings, starting with her initial arraignment and through her plea agreement and subsequent probation. Per the plea agreement, as explained by Mr. Haley, the State reduced Ms. White's blood alcohol content to 0.149 (in order for her to avoid mandatory jail time) and dismissed the reckless driving, driving under suspended license, and negligent injury charges. In exchange, Ms. White pled guilty to DUI. Regarding the negligent injury charge, Mr. Haley specified it was "nolle prossed" or dismissed. Mr. Haley explained the State subsequently closed the municipal and traffic court cases against Ms. White after she successfully completed the conditions of her probation. Mr. Haley then stated that at the time Ms. White and the State entered

the plea agreement in November 2017, Mr. Scott had already passed away and all parties were aware of Mr. Scott's passing. Mr. Haley also testified that Ms. White entered into the plea agreement because she was afraid to go to jail, not because she was guilty. Finally, Mr. Haley noted that he believed the matter was fully resolved after the parties reached the plea agreement and Ms. White fulfilled her obligations under the plea agreement.

### *Alicia White's Testimony*

Finally, Ms. White testified on her own behalf, stating she was not drunk on April 24, 2016, when the accident happened, nor had she had anything to drink that morning. Rather, according to Ms. White, she went to her brother's house around 6:00 p.m. the evening prior at which point she drank from a "little $5 bottle of gin," which she described as "[t]he smallest bottle they serve." Ms. White explained that she drank the gin both straight from a shot glass and also with mixers and that the amount she drank was only four drinks' worth. Ms. White then stated she stopped drinking around 10:30 p.m. According to her testimony, Ms. White did not feel any effects of the alcohol on the morning of the accident. Instead, Ms. White explained that she woke up around 9:00 a.m. feeling hungry, not drunk, and drove to get breakfast.

Ms. White's counsel asked her about a particular statement she made at the scene of the accident as heard on body worn camera, whereupon the following colloquy occurred:

> Q. Okay. So, I want to ask you about something that we saw on the body camera and then also that Detective Ellis testified about yesterday. A statement that you made. When Detective Ellis told you that he smelled alcohol on your breath when [he was] putting you in the police car, did you hear what you responded?
>
> A. Yes.

Q. Do you remember what it was?

A. I [did not] remember, but I saw it on the video.

Q. Okay. And you said something like I [have not] been drinking since [I have] been here.

A. Uh-huh (Affirmative response).

Q. Does that sound right?

A. Uh-huh (Affirmative response).

Q. Okay. Do you remember saying that?

A. I [did not] remember it, but I saw it on the video.

Q. Okay. And what did you mean by that?

A. Because he said he smell [sic] alcohol on my breath, and my assumption was just like I [did not] drink anything here. You know, I was just trying to explain to him I [was not] drunk and, you know, I just blurted that out.

Q. Okay. So, am I understanding that when Detective Ellis is saying I smell alcohol on your breath, your understanding was that [he is] saying you must have just drank, like just now?

A. Yes, [that is] what I thought he was saying because why else would he say that?

Q. Okay. Okay. So, had you drank anything since you got to Francis Street?

A. No.

Q. And had you drank anything that morning?

A. No.

Ms. White explained that she had brushed her teeth at least once between drinking and encountering the officers so she did not know why or how they smelled alcohol on her breath. Additionally, regarding her decision to consent to a breathalyzer test, Ms. White stated she merely agreed because she wanted to

demonstrate to the officers that she was not intoxicated and believed the breathalyzer would prove so.

Turning to the accident itself, Ms. White then explained that the on-ramp at Morrison Road—where she attempted to enter the highway—was very short. Ms. White stated that as she tried to merge onto the highway the driver of another car slowed down as if to let her merge onto the highway in front of him but then accelerated as she began to enter the highway. Ms. White testified that the on-ramp then suddenly ended and she was forced back onto the shoulder to avoid hitting another car in front of her. Thereafter, according to Ms. White, she intended to wait on the shoulder for the other cars to pass so that she could merge onto the interstate, but when she returned to the shoulder she lost control of her car. Additionally, Ms. White explained that traffic was busier than usual for a Sunday morning because in addition to Jazz Fest, there was also "a game that day." When asked about Mr. Sherlock's earlier testimony, Ms. White stated that she did not remember the encounter on the roadway that he described. She also stated that she could not have been going at a high rate of speed because she never got past the on-ramp, nor did she try to force her way in front of two cars to get on the interstate. Ms. White did admit to "flipping the bird" at the driver who blocked her from merging and who she claimed was the cause of the accident. Ms. White stated that after her car left the roadway and hit the grass, she tried to apply the brakes but her car did not stop. Ms. White further testified that prior to the accident she did not have any other trouble with her brakes and was able to drive normally.

Regarding the scene after the accident occurred, Ms. White testified that her car never made contact with any person and so she told the bystanders that she did not hit anyone. Ms. White explained that, at that time, she did not yet know anyone

15

had been hurt. Further, Ms. White explained that to the extent she seemed uncooperative in the body camera footage played during trial, it was because she felt threatened by the chaos of the post-accident scene, the "aggressive" attitude people exhibited toward her, and the fact that she had just been in an accident, not because she was drunk. Ms. White testified that after learning of Mr. Scott's condition she felt "horrible" even though she felt she did everything she could to avoid hurting anyone. However, Ms. White stated that although she felt bad about what happened to Mr. Scott, she did not feel responsible.

Turning to the plea agreement, Ms. White testified that she agreed to it because she wanted to help Mr. Scott receive an insurance settlement. Ms. White explained that avoiding jailtime was a "perk" but not her main reason for taking the plea. Ms. White admitted to saying under oath that she was guilty of driving under the influence as part of the plea agreement, but she stated she did so because she did not think that she could "beat" the breathalyzer test and because she wanted Mr. Scott to be able to get a financial settlement from insurance.

At the conclusion of the trial on May 1, 2024, the jury found Ms. White guilty of the lesser verdict of negligent homicide.

**Sentencing and Motion for New Trial**

On May 9, 2024, Ms. White filed a Motion for New Trial, which the district court denied on August 22, 2024. Then, on September 5, 2024, Ms. White appeared for her sentencing hearing, and the district court sentenced her to five years at hard labor, with three years executory and two suspended, as well as two years of probation to be served on house arrest. Ms. White's timely appeal to this Court followed.

16

## ASSIGNMENTS OF ERROR

Ms. White assigns six errors on appeal:

[1.] The State failed to prove criminal negligence or that [Ms. White]'s actions in 2016 were the proximate cause of death of [Mr.] Scott in 2017.

[2.] The [district] court erred in denying the [First] Motion to Quash the vehicular homicide charge that was filed in violation of the plea agreement.

[3.] The trial of [Ms. White] by a six[-]person jury violated due process; the [district] court erred in denying [her] motion for a twelve[-] person jury.

[4.] The [district] court erred in denying the [Second] Motion to Quash where both the institution of the prosecution and the institution of trial were untimely.

[5.] The [district] court erred in denying [Ms. White]'s request for special jury instructions on negligent injuring, resulting in the denial of the right to have her defense considered by the jury.

[6.] The [district] court erred in allowing the State to use hearsay evidence under the non-existent "investigation" exception. The error violated [Ms. White]'s right to confrontation and cross examination of the witnesses against her.

Before discussing Ms. White's assignments of error, we begin with our errors patent review.

## ERRORS PATENT REVIEW

In accordance with La. C.Cr.P. art. 920, we review all criminal appeals for errors patent. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2). We have reviewed the pleadings and proceedings in this record, and find that there are no errors patent. Next, we begin our discussion of Ms. White's first assignment of error.

**DISCUSSION**

**<u>Whether the State Presented Sufficient Evidence to Support Ms. White's Conviction</u>**

*Preliminary Issue and Standard of Review*

In her first assignment of error, Ms. White argues the State did not present sufficient evidence to support her conviction for negligent homicide. In particular, Ms. White contends the State's evidence did not establish that her alleged negligence was the cause of the accident. Ms. White further contends the State failed to present sufficient evidence that the injuries sustained by Mr. Scott in the accident were the proximate or direct cause of his death.

This Court has previously explained that if an appellant raises a sufficiency of the evidence argument among other alleged trial errors, then the reviewing court must first resolve the sufficiency of the evidence issue. *State v. McDonough*, 2022-0628, p. 21 (La. App. 4 Cir. 10/27/23), 376 So.3d 1003, 1019 (citing *State v. Dukes*, 2019-0172, p. 7 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 751). This Court has further explained that "[t]his is because 'the accused may be entitled to an acquittal' thereby eliminating the need to discuss the accused's other assignments of error." *Id*. (quoting *State v. Groves*, 2020-0450, p. 21 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 971). Accordingly, we review Ms. White's sufficiency of the evidence claim first not simply because it is her first assignment of error but for the foregoing reasons.

As further explained by this Court in *McDonough* and prior jurisprudence, Louisiana appellate courts "review sufficiency of the evidence claims 'by determining whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that all of the

elements of the offense had been proven beyond a reasonable doubt.'" 2022-0628, p. 21, 376 So.3d at 1020 (quoting *Groves*, 2020-0450, p. 21, 323 So.3d at 971). This standard, derived from *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is based on the notion of rationality. *Id*. (citing *Dukes*, 2019-0172, p. 7, 281 So.3d at 752). As such, "an appellate court must consider the whole record 'because a rational trier of fact would consider all [of] the evidence.'" *Id*. (alteration in original) (quoting *Dukes*, 2019-0172, p. 7, 281 So.3d at 752). Furthermore, "the appellate court is to presume that the actual trier of fact 'acted rationally until it appears otherwise.'" *Id*. at pp. 21-22, 376 So.3d at 1020. According to this standard, "'[i]f rational triers of fact could disagree as to the interpretation of the evidence,' then the 'view of all the evidence most favorable to the prosecution must be adopted.'" *Id*. at p. 22, 376 So.3d at 1020 (alteration in original) (quoting *Dukes*, 2019-0172, pp. 7-8, 281 So.3d at 752).

However, it is not the role of the appellate court to "assess the credibility of witnesses or reweigh the evidence because '[c]redibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the trier of fact.'" *Id.* (alteration in original) (quoting *Dukes*, 2019-0172, p. 8, 281 So.3d at 752). Similarly, "conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency," so "[s]uch a determination rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." *Id*. (alteration in original). If the record lacks "internal contradiction or irreconcilable conflict with the physical evidence," jurisprudence establishes that "a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." *Id*. Accordingly, we review the record to ascertain whether, after viewing the evidence in the light most favorable to the

State, any rational trier of fact could have found the State presented sufficient evidence to convict Ms. White. Before doing so, however, we address a preliminary issue, specifically which crime to consider in our discussion—vehicular homicide (the crime with which the State charged Ms. White) or negligent homicide (the crime for which the jury convicted Ms. White).

***Failure to Object to Responsive Verdict***

As noted previously, the State initially charged Ms. White with one count of vehicular homicide, but the jury found her guilty of the lesser, responsive charge of one count of negligent homicide. This Court recently explained that if an appellant raises a sufficiency of the evidence claim on appeal regarding her conviction for a lesser, responsive charge for which she "fail[ed] to lodge a contemporaneous objection, when the trial judge [could have] take[n] action," then "a reviewing court may affirm if the evidence supports a conviction of the greater offense.'" *State v. Billiot*, 2023-0529, p. 18 (La. App. 4 Cir. 5/16/25), 414 So.3d 1117, 1129 (internal quotation marks omitted) (quoting *State v. Pleasant*, 2010-1533, p. 7 (La. App. 4 Cir. 5/18/11), 66 So.3d 51, 56). In support of this rule, this Court reasoned:

> [i]t would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offence charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object.

*Pleasant*, 2010-1533, p. 7, 66 So.3d at 56 (alteration in original) (quoting *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 251-52 (La. 1982)). Thus, as explained by the Louisiana Supreme Court in *Blackburn*, absent an objection entered "after the jury is charged, but before the jury begins to deliberate," the "reviewing court may affirm if the evidence supports a conviction of the greater offense." 424 So.2d at 251. *See also State v. Miller*, 2015-720, p. 6 (La. App. 3 Cir. 2/3/16), 185 So.3d

20

264, 268 (holding that if "a rational trier of fact could reasonably find the evidence supports a conviction for [the greater, charged offense of] second degree murder," then "the jury could conclude the State proved the essential elements of [the lesser, responsive offense of] negligent homicide beyond a reasonable doubt"). In line with the foregoing, our discussion of this assignment of error will resolve whether the State proved the elements of vehicular homicide, the crime with which the State charged Ms. White.

### *Vehicular Homicide – Definition and Elements of the Crime*

The Louisiana Revised Statutes define vehicular homicide as:

> the killing of a human being cause proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, . . . whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exists and such condition was a contributing factor to the killing:
>
> (1)   The operator is impaired by alcoholic beverages as determined by chemical tests administered under the provisions of [La.] R.S. 32:662.
>
> (2)   The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.

La. R.S. 14:32.1. To convict a defendant for vehicular homicide, the Louisiana Supreme Court has held the State must prove four things per La. R.S. 14:32.1: "1) the killing of a human being; 2) caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle; 3) a prohibited degree of intoxication; and 4) a link between the intoxication and the killing," where "the link . . . does not have to be a 'proximate cause,' but simply a 'contributing factor.'" *State v. Leger*, 2017-2084, p. 10 (La. 6/26/19), 284 So.3d 609, 615-16.   The Louisiana Supreme Court has further

explained that "[a] 'proximate cause' is one that directly produces an event and without which the event would not have occurred" whereas a "'contributing cause' is a factor that - though not the primary cause - plays a part in producing a result." *Id*. at p. 10, 284 So.3d at 616 (citing BLACK'S LAW DICTIONARY (10th ed. 2014)).

Furthermore, "[c]ausation is a question of fact which has to be considered in . . . light of the totality of the circumstances surrounding the ultimate harm and its relation to the actor's conduct." *Id*. at p. 13, 284 So.3d at 617 (quoting *State v. Kalathakis*, 563 So.2d 228, 231 (La. 1990)). To this end, the Louisiana Supreme Court has clarified that "a defendant should not be held responsible for remote and indirect consequences which a reasonable person could not have foreseen as likely to have flowed from his conduct or from those which would have occurred regardless of his conduct" but should be held responsible for "the consequences of [his] behavior" that "are not so far removed from his conduct that he should be absolved for his intoxicated state." *Id*. (citing *Kalathakis*, 563 So.2d at 231). This is because "[t]he evident purpose of the vehicular homicide statute is to curb traffic fatalities caused by the consumption of alcohol" and thus "it is reasonable to hold intoxicated drivers to a higher standard of care in order to discourage that behavior and effectuate the legislative intent" behind La. R.S. 14:32.1. *Id*. at p. 11, 284 So.3d at 616 (quoting *State v. Taylor*, 463 So.2d 1274, 1275 (La. 1985)).

In *Leger*, the Louisiana Supreme Court found "the [S]tate introduced compelling circumstantial evidence" that the driver's "aggressive behavior" contributed to or caused a collision, including driving erratically at a high rate of speed; flashing bright lights; attempting to pass on the right side while driving partially on the shoulder; and driving while intoxicated. *Id*. at p. 13, 284 So.3d at 617-18. Regarding that behavior, the Louisiana Supreme Court noted the members

of the jury, "[b]ased on their own experiences dealing with intoxicated people . . . could have rationally inferred that [the] defendant's intoxication—which was undisputed—was a contributing factor in the sequence of events that led to his truck colliding with [another] vehicle, crossing the median, slamming into two vehicles, and killing five victims." *Id.* at p. 13, 284 So.3d at 618. Further, the Louisiana Supreme Court addressed "the hypothesis of innocence proposed by [the] defendant that his intoxication could be forgiven and found not to be a contributing factor because the [other driver with whom he collided] engaged in equally combative behavior despite being sober." *Id.* at p. 14, 284 So.3d at 618. The court held "the jury rationally rejected [that] hypothesis" because the State "did not have to prove that [the] defendant's intoxication was the sole cause of the accident" as "the jury could have rationally concluded that [the] defendant's intoxication either spurred his aggressive behavior, resulted in his refusal to withdraw from the dangerous situation, or both." *Id.* (first citing *State v. Beene*, 49,612, p. 8 (La. App. 2 Cir. 4/15/15), 164 So.3d 299, 304; and then citing *State in the Interest of R.V.*, 2011-0138, p. 14 (La. App. 5 Cir. 12/13/11), 82 So.3d 402, 410).

*Analysis*

In the instant matter, Ms. White asserts first that the State failed to prove that she was criminally negligent by being intoxicated and second that the accident caused Mr. Scott's death. It is undisputed that Mr. Scott ultimately passed away. As such, the first element of vehicular homicide, 1) the killing of a human being, is satisfied, leaving the following elements in dispute: 2) whether the death was caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle; 3) whether the driver was in a

prohibited degree of intoxication; and 4) whether a link existed between the intoxication and the killing. We discuss the remaining elements out of order by turning next to the third element and then discussing the second and fourth elements.

### 3) Prohibited Degree of Intoxication

As to the intoxication element, the State presented the testimony of Detectives Ellis and Baldassaro. Both Detectives testified they detected the moderate odor of alcohol on Ms. White's breath, Detective Ellis at the scene of the accident and Detective Baldassaro shortly after the accident at the Orleans Parish DUI office. Detective Baldassaro testified that Ms. White's blood alcohol content was 0.165 according to the NOPD's breathalyzer machine, which is more than twice the legal limit for drivers of 0.08. Accordingly, the jury could have rationally concluded the State proved beyond a reasonable doubt that Ms. White was illegally intoxicated at the time of the accident.

### 2) Causation

As to the causation element, the State presented as a witness Mr. Sherlock who testified that he personally witnessed Ms. White driving erratically because he himself was almost involved in an accident due to her actions. Specifically, Mr. Sherlock testified Ms. White entered the interstate at a high rate of speed and swerved in and out of traffic while trying to merge onto the interstate. Additionally, Mr. Sherlock stated that Ms. White almost hit the vehicle in front of him and that he and another vehicle were forced to brake suddenly and swerve to avoid hitting one another and the vehicles in front of them, who also swerved and braked in response to Ms. White's approach. Mr. Sherlock further testified as to Ms. White's aggressive behavior, stating that she "shot the bird" at another driver

before hitting a guard rail, being thrown from the interstate, and ultimately crashing through multiple backyards which ran adjacent to the interstate. In response, Ms. White presented the testimony of Officer Sartain and Mr. Evans. Mr. Evans was involved in another accident which occurred on the same stretch of interstate at approximately the same time, and Officer Sartain was the officer assigned to that accident. Counsel for Ms. White likely elicited this testimony with the intent of establishing that Ms. White's driving was not the cause of the accident but rather the dangerousness of this particular stretch of interstate and the traffic conditions present at the time were responsible for the subject accident.

As in *Leger*, however, where the Louisiana Supreme Court found the State introduced "compelling circumstantial evidence" through independent witness testimony regarding the defendant driver's behavior, the jury here could rationally have concluded that according to Mr. Sherlock's testimony, Ms. White's behavior, driving aggressively and erratically at a high rate of speed, either contributed to or caused the accident. 2017-2084, p. 10, 284 So.3d at 616. Though Ms. White asserted that heavy traffic and the presence of other, unidentified, aggressive drivers caused her to leave the roadway, we find Mr. Sherlock's testimony constituted compelling circumstantial evidence of Ms. White's erratic and aggressive behavior prior to the accident. Accordingly, the jurors, based on their own experiences dealing with intoxicated people, could have rationally inferred Ms. White's intoxication was a contributing factor or the cause of the subject accident. Moreover, as in *Leger*, we find the jury rationally rejected Ms. White's hypothesis of innocence that her intoxication could be forgiven and found not to be a contributing factor because there were other aggressive drivers in traffic. For one thing, as established in *Leger*, the State did not have to prove that Ms. White's

25

intoxication was the sole cause of the accident. Secondly, even if there were other aggressive drivers and traffic, the jury could have rationally concluded that Ms. White's intoxication spurred her aggressive behavior and therefore contributed to the accident.

### 4) Link Between the Intoxication and the Killing

Finally, as to the link between the intoxication and the killing, the State presented the testimony of Dr. Krausert, the medical examiner who conducted Mr. Scott's autopsy following his death. Although Mr. Scott had a variety of preexisting health conditions, Dr. Krausert testified that these preexisting conditions were not the cause of his death. Instead, Dr. Krausert explained that a clear causal chain existed between the accident and Mr. Scott's death. Specifically, Dr. Krausert testified the accident caused a traumatic brain injury; a symptom of Mr. Scott's traumatic brain injury was dysphagia, or difficulty swallowing; and the dysphagia led to aspiration pneumonia. Dr. Krausert testified that although Mr. Scott died more than one year after the accident, his death was a direct result of the injuries he sustained in the accident. Accordingly, we hold a rational jury could find that Ms. White's intoxication was either linked to or a contributing factor to Mr. Scott's death based on Dr. Krausert's testimony.

In sum, the evidence was sufficient to sustain a greater conviction of vehicular homicide against Ms. White, so it was necessarily also sufficient to sustain the lesser conviction and included offense of negligent homicide. Accordingly, Ms. White's first assignment of error is without merit.

<u>**Whether the State Violated the Plea Agreement and/or Violated Double Jeopardy by Charging Ms. White with Vehicular Homicide after the Execution of Said Plea Agreement**</u>

In her second assignment of error, Ms. White asserts the State violated her constitutional right against double jeopardy and the standard of collateral estoppel by charging her with vehicular homicide after she had already entered into and served the condition of the plea agreement for the original charges brought against her in the traffic court proceedings. Ms. White raised this issue in her First Motion to Quash and again in her Motion for New Trial, both of which the district court denied.

This Court has explained that the standard of review that applies in "reviewing a district court's ruling on a motion to quash varies based on the types of issues presented." *State v. Smith*, 2024-0092, p. 4 (La. App. 4 Cir. 4/11/25), 414 So.3d 927, 931 (quoting *State v. Harris*, 2019-0900, p. 5 (La. App. 4 Cir. 7/22/20), 302 So.3d 1177, 1180). "When solely legal issues are presented," the appellate courts "apply a *de novo* standard of review." *Id*. However, when the case presents "mixed issues of fact and law . . . such as speedy trial violations and **_nolle prosequi_** **dismissal reinstitution cases**," the appellate courts "apply an abuse of discretion standard." *Id.* (second alteration in original).

As explained by this Court, both "[t]he Fifth Amendment to the United States Constitution and Article I, § 15 of the Louisiana Constitution prohibit placing a person twice in jeopardy of life or limb for the same offense." *State v. Dominick*, 2023-0066, p. 4 (La. App. 4 Cir. 6/6/23), 368 So.3d 698, 701. In pertinent part, "[i]nherent in the guarantee against double jeopardy" is the "constitutional protection[] . . . against multiple punishments for the same offense." *Id.* (quoting *State v. David*, 468 So.2d 1133, 1135 (La. 1985)). "The protections

against double jeopardy mandated by the federal constitution, as re-stated in this state's constitution, fall within the analytical framework set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)." *State v. Ford*, 2024-197, p. 32 (La. App. 5 Cir. 2/26/25), 406 So.3d 652, 678 (citing *State v. Frank*, 2016-1160, p. 10 (La. 10/18/17), 234 So.3d 27, 34). *Blockburger* questions "whether the same act or transaction constitutes a violation of two distinct statutory provisions," and "the pertinent question is whether each provision requires proof of an additional fact, which the other does not." *Id.* at p. 32, 406 So.3d at 678-79 (first citing *State v. Knowles*, 392 So.2d 651, 654 (La. 1980); and then citing *State v. Bridgewater*, 1998-658, p. 9 (La. App. 5 Cir. 12/16/98), 726 So.2d 987, 991). That is, the Louisiana Fifth Circuit Court of Appeal has explained that "[a] defendant can be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." *Id.* at p. 32, 406 So.3d at 679 (quoting *State v. Hampton*, 2017-383, p. 12 (La. App. 3 Cir. 11/15/17), 259 So.3d 1125, 1132). Similarly, collateral estoppel is a "component of double jeopardy" which provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *State v. Butler*, 2014-1016, p. 8 (La. App. 4 Cir. 2/11/15), 162 So.3d 455, 462 (quoting *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)).

The matter *sub judice* concerns a plea agreement and a subsequent conviction stemming from the same accident rather than two convictions for the same incident. Regarding plea agreements, this Court has explained that the "[e]stablished jurisprudence has long abided by the principle that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can

be said to have been a part of the inducement or consideration, such promise must be fulfilled." *State v. Laugand*, 2013-0795 (La. App. 4 Cir. 1/15/14), 2014 WL 529979, at *3 (first citing *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); and then citing *State v. Armstead*, 599 So.2d 425, 426 (La. App. 4th Cir. 1992)). "[R]easoning that a plea [agreement] is [a] contract between the [S]tate and one accused of a crime," Louisiana courts have held that "[i]n the context of plea bargains, a defendant may [only] demand specific performance of the [S]tate's promise if he can show that the parties reached an agreement, that he performed his part of the agreement, and that in doing so, he relinquished a fundamental right." *State v. Givens*, 1999-3518, p. 15 (La. 1/17/01), 776 So.2d 443, 455 (first citing *State v. Louis*, 1994-0761, p. 9 (La. 11/30/94), 645 So.2d 1144, 1149; and then citing *State v. Tanner*, 425 So.2d 760, 763 (La. 1983)).

For example, in *State v. Fontenot*, the defendant initially pled guilty to operating a vehicle while intoxicated and moved to quash the subsequent negligent homicide charge the State brought against him, asserting that this later prosecution violated double jeopardy. 408 So.2d 919, 921 (La. 1981). In applying the *Blockburger* test, the Louisiana Supreme Court determined that driving while intoxicated required proof only that the defendant was operating a motor vehicle while under the influence of alcohol, whereas negligent homicide required proof of criminal negligence and that a killing resulted from that negligence. *Id.* Accordingly, each crime required proof of facts not required by the other, thereby satisfying the *Blockburger* test and avoiding a double jeopardy violation. *Id*.

In the plea agreement in traffic court, Ms. White pled guilty to driving while intoxicated, a violation of La. R.S. 14:98, and the State dismissed the other municipal and traffic court charges against her. The offense of operating a vehicle

while impaired, as set for in La. R.S. 14:98, requires proof only that the defendant was "operating any motor vehicle when . . . [t]he operator's blood alcohol concentration is 0.08 percent or more by weight based on grams of alcohol per one hundred cubic centimeters of blood." La. R.S. 14:98(A)(1)(b). As previously established, the offense of vehicular homicide, with which the State subsequently charged Ms. White, requires proof of 1) the killing of a human being; 2) caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle; 3) a prohibited degree of intoxication; and 4) a link between the intoxication and the killing." *Leger*, 2017-2084, p. 10, 284 So.3d at 615. As in *Fontenot,* the charge Ms. White pled guilty to in the traffic court proceedings, operating a vehicle while impaired, did not require proof of death, causation, or a link between a death and the intoxication, but vehicular homicide does. Accordingly, each crime required proof of facts not required by the other, and the *Blockburger* test is satisfied. As such, Ms. White's prosecution for vehicular homicide did not violate double jeopardy.

Moreover, although Ms. White and her former counsel, Mr. Haley, testified that they believed that the plea agreement would be sufficient to "get this ordeal behind her" and have her avoid any jail time, Ms. White failed to establish that her plea agreement contained "a promise or agreement of the prosecutor" not to file new charges against her, such that the prosecutor's "promise must be fulfilled." *Laugand*, 2013-0795, 2014 WL 529979, at *3. To the contrary, the record establishes the plea agreement stated that Ms. White could be charged with a greater offense related to the subject accident. Based on the record, in the plea agreement, the State merely agreed to drop the other then-pending charges against Ms. White in the traffic court proceedings, namely operating under a suspended

30

license in violation of La. R.S. 14:415 and reckless operation in violation of La. R.S. 14:99. While the record establishes Ms. White performed her part of the plea agreement, she failed to further establish the State promised not to prosecute her for vehicular homicide such that she could demand specific performance of same. *Givens*, 1999-3518, p. 15, 776 So.2d at 455. Accordingly, the district court did not err in denying Ms. White's First Motion to Quash. Her second assignment of error is without merit.

## Whether a Six-Person Jury Violated Ms. White's Sixth Amendment Right to a Jury Trial

In her third assignment of error, Ms. White asserts the district court violated her due process rights under the Sixth and Fourteenth Amendments by her trial by a six-person jury and that the district court erred in denying her pre-trial Motion for a Twelve-Person jury. Article I, Section 17(A) of the Louisiana Constitution provides in pertinent part that "[a] case in which the punishment may be confinement at hard labor or confinement without hard labor for more than six months shall be tried before a jury of six persons, all of whom must concur to render a verdict." Louisiana Code of Criminal Procedure Article 782(A) reiterates this jury requirement, stating "[a] case in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict."

In *State v. Adams*, this Court noted that the Louisiana Legislature used "the word 'shall' in La. C.Cr.P. art. 782(A)," thereby establishing "that trial by a six-person jury on the charges at issue here is mandatory, not discretionary." 2023-0770, pp. 2-3 (La. App. 4 Cir. 1/3/24), 381 So.3d 113, 115 (citing La. C.Cr.P. art.

5).[10] As such, this Court held that the district court did not have the authority to ignore the mandatory language in La. C.Cr.P. art. 782(A). *Id.* Moreover, at present, the constitutionality of six-person juries remain settled by *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 4446 (1970).

In the matter *sub judice*, the State charged Ms. White with the offense of vehicular homicide, in violation of La. R.S. 14:32.1, which carries a mandatory sentence of imprisonment "with or without hard labor for not less than five years nor more than thirty years." La. R.S. 14:32.1(B). Accordingly, the district court did not err in denying Ms. White's Motion for a Twelve-Person Jury and, in fact, would have erred if it had granted the motion, given the mandatory language of La. C.Cr.P. art. 782(A). Accordingly, the district court did not violate Ms. White's due process rights by proceeding with a six-person jury. Ms. White's third assignment of error is without merit.

### Whether the District Court Erred in Denying Ms. White's Second Motion to Quash

In her fourth assignment of error, Ms. White asserts the district court erred in denying her Second Motion to Quash because the State did not timely initiate prosecution against her and the State did not timely commence her trial, noting in her brief to this Court that "*eight years* . . . passed before [she] went to trial." Of note, in terms of Ms. White's statutory right to a speedy trial, Ms. White and the State agree the State had four years to institute the vehicular homicide prosecution, but they disagree as to when that four-year time period commenced. Specifically, Ms. White asserts the State failed to timely institute the vehicular homicide prosecution after April 24, 2016, the date of the subject accident, whereas the State

---

[10] Louisiana Code of Criminal Procedure Article 5 provides that "[t]he word 'shall' is mandatory, and the word 'may' is permissive."

counters the pertinent date for the commencement of the prescriptive period was instead August 11, 2017, the date of Mr. Scott's death. The State filed its bill of information against Ms. White, charging her with vehicular homicide, on June 25, 2020, which was less than three years after Mr. Scott's death. Regarding the alleged untimeliness of the commencement of trial, Ms. White notes "the delay between institution of prosecution [on June 25, 2020,] and trial [beginning on April 29, 2024,] was nearly four years," i.e., more than the two-year period established by the Louisiana Criminal Code for non-capital, felony cases. The State counters that "this [two-year] period is subject to interruption or suspension for various reasons," including the filing of and ruling on preliminary pleas. Turning to her constitutional right to a speedy trial, Ms. White asserts that applying the factors established by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the delay in her case was "uncommonly long" and violated her Sixth Amendment rights. Countering, the State notes Ms. White "makes no attempt to allege actual prejudice caused by the delay," such that her constitutional claim should fail.

Before addressing the merits of the parties' above-summarized arguments, we reiterate the standard of review applicable to motions to quash. As previously stated, if a motion to quash presented legal issues only, then the appellate court applies the *de novo* standard of review. *Smith*, 2024-0092, p. 4, 414 So.3d at 931 (quoting *Harris*, 2019-0900, p. 5 (La. App. 4 Cir. 7/22/20), 302 So.3d 1177, 1180-81). If the motion to quash presented issues of fact and law, the appellate court applies the abuse of discretion standard of review. *Id.*

"Louisiana jurisprudence recognizes two separate and distinct bases for a defendant's right to a speedy trial: a statutory right granted by La. C.Cr.P. art.

33

701[11] [and 578[12]] and a constitutional right guaranteed by the Sixth Amendment to the United States Constitution[13] and Article I, § 16 of the Louisiana Constitution.[14]" *State v. Andrews*, 2018-0149, 0339, p. 8 (La. App. 4 Cir. 9/12/18), 255 So.3d 1106, 1113 (citing *State v. Sorden*, 2009-1416, p. 7 (La. App. 4 Cir. 8/4/10), 45 So.3d 181, 185). This Court has further explained that "[t]he two are not equivalent; 'the question of whether a speedy trial violation is statutory or constitutional involves wholly separate inquiries." *Id.* (quoting *Sorden*, 2009-1416, p. 7, 45 So.3d at 186). Because the statutory and constitutional bases for the right to a speedy trial are distinct, we will separate them in our analysis, beginning with the former.

_____

[11] Louisiana Code of Criminal Procedure Article 701(A) provides that "[t]he [S]tate and the defendant have the right to a speedy trial."

[12] Louisiana Code of Criminal Procedure Article 578, which is discussed again later in this Opinion, states:

> A. Except as otherwise provided in this Chapter, no trial shall be commenced nor any bail obligation be enforceable:
>
> (1) In capital cases after three years from the date of institution of the prosecution;
>
> (2) In other felony cases after two years from the date of institution of the prosecution; and
>
> (3) In misdemeanor cases after one year from the date of institution of the prosecution.
>
> B. The offense charged shall determine the applicable limitation.

[13] The Sixth Amendment to the United States Constitution establishes:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

[14] Louisiana Constitution Article I, Section 16 provides, in pertinent part, that "[e]very person charged with a crime is presumed innocent until proven guilty and is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law."

### Statutory Right to Speedy Trial – Initiation of Prosecution

"Statutes of limitation" constitute "the primary protection against stale criminal charges." *State v. Cole*, 384 So.2d 374, 376 (La. 1980) (citing *State v. Crain*, 379 So.2d 1094, 1096 (La. 1980)). Louisiana Code of Criminal Procedure Article 572 is one such protection against stale charges, delineating the time "[l]imitation of prosecution [for] noncapital offenses." It provides, in pertinent part:

> [A.] [N]o person shall be prosecuted, tried, or punished for an offense not punishable by death or life imprisonment, unless the prosecution is instituted within the following periods of time after the offense has been committed:
>
> . . . .
>
> (2) Four years, for a felony not necessarily punishable by imprisonment at hard labor.

La. C.Cr.P. art. 572(A)(2). In discussing La. C.Cr.P. art 572(A), the Louisiana Second Circuit Court of Appeal ("Second Circuit") has explained that "the time limitation for the institution of prosecution commences 'after the offense has been committed'" based on the statutory language and with "limited exceptions." *State v. Lester*, 49,787, p. 7 (La. App. 2 Cir. 5/20/15), 165 So.3d 1181, 1186. As the Second Circuit further explained in *Lester*, the Louisiana Legislature enacted La. C.Cr.P. art. 572 to "protect[]" individuals from "punishment . . . [for] acts in the far-distant past" and "from having to defend themselves against charges when the basic facts may have become obscured by the passage of time," thereby eliminating a defendant's "means of defense." *Id.* (quoting *State v. Stetson*, 317 So.2d 172, 174-75 (La. 1975)).

The crime with which the State charged Ms. White, vehicular homicide, is "a felony not necessarily punishable by imprisonment at hard labor" (La. R.S.

14:32.1), so the permissible delay for the institution of prosecution was four years. La. C.Cr.P. art. 572(A)(2). As mentioned previously, both parties agree that the time period was four years but correctly frame the issue as whether that four-year period commenced on the date of the accident, as argued by Ms. White, or the date of Mr. Scott's death, as argued by the State. Louisiana Code of Criminal Procedure Article 572 does not explicitly address when the offense is deemed "committed" in cases where the offense involves a death that occurs after the initial act, such as can happen with vehicular homicide. As previously stated, however, La. R.S. 14:32.1 requires the State to prove, in pertinent part, "the killing of a human being" and "a link between the [defendant driver's] intoxication and the killing." We find it axiomatic, therefore, that the offense of vehicular homicide cannot be considered "committed" until the death of the victim occurs. Prior to that point, two of the four elements of the offense are missing, such that the State would be unable to support a prosecution and conviction for same. To hold that the four-year prescriptive period for vehicular homicide commences before the death of the victim would simply be impractical and irrational.

In addition to finding Ms. White's contention that the prescriptive period commenced on the date of the accident to be legally incorrect and impractical in application, we further note that, based on the timeline of this case, our holding that the prescriptive period commenced instead on the date of Mr. Scott's death does not contravene the Legislature's intent behind enacting La. C.Cr.P. art. 572. That is, this timeline did not result in punishment for Ms. White "[for] acts in the far-distant past." *Lester*, 49787, p. 7, 165 So.3d at 1186. Rather, the State brought the vehicular homicide charge against Ms. White on June 25, 2020, a mere two months after the four-year deadline of April 25, 2020, that Ms. White claims was

36

applicable to her case. Likewise, the record does not establish how the passage of those two months' time (i.e., between the deadline Ms. White claims is applicable and the date the State initiated prosecution) obscured any of the basic facts of the case and, correspondingly, the loss of any defenses for Ms. White. In sum, the district court did not err in denying Ms. White's Second Motion to Quash insofar as the State timely initiated its prosecution for vehicular homicide against her.

***Statutory Right to Speedy Trial – Commencement of Trial***

As for the timeliness of the commencement of trial, La. C.Cr.P. art. 578(A)(2) provides, in pertinent part, that "[e]xcept as otherwise provided in this Chapter, no trial shall be commenced . . . in [non-capital] felony cases after two years from the date of institution of the prosecution." Louisiana Code of Criminal Procedure Article 580 establishes when the time limit in La. C.Cr.P. art. 578 is suspended, specifically "[w]hen a defendant files a motion to quash or other preliminary plea" and "until the ruling of the court thereon." Thereafter, according to La. C.Cr.P. art. 580, "in no case shall the state have less than one year after the ruling [on the motion to quash or other preliminary plea] to commence trial." "Preliminary pleas that suspend the running of the prescriptive period under [La. C.Cr.P.] art[.] 580 include motions to suppress evidence, motions for preliminary hearing, motions for continuance filed by defendant, and joint motions for continuance." *State v. Brazile*, 2006-1611, p. 3 (La. App. 4 Cir. 5/30/07), 960 So.2d 333, 335 (citations omitted). "When a defendant moves to quash the indictment asserting an apparently meritorious claim that the time limitation has expired, the State bears the burden to show that either an interruption or suspension of the time limitation occurred and that the commencement of trial is timely." *State*

*v. Joseph*, 2018-0867, p. 6 (La. App. 4 Cir. 3/20/19), 363 So.3d 309, 315 (citing *Sorden*, 2009-1416, p. 5, 45 So.3d at 184).

As to the timeliness of the commencement of Ms. White's trial, the State filed the bill of information that charged Ms. White with vehicular homicide, which is a non-capital felony offence, on June 25, 2020. Accordingly, under La. C.Cr.P. art. 578(A)(2), because the State charged Ms. White with a non-capital felony offense, her trial had to begin within two years of the State initiating prosecution, i.e., no later than June 25, 2022. However, as previously stated, Ms. White's trial did not commence until April 29, 2024, which was after June 25, 2022. This means Ms. White "move[d] to quash the indictment" based on "an apparently meritorious claim that the time limitation [of La. C.Cr.P. art. 578(A)(2) ha[d] expired," such that "the State [bore] the burden to show that either an interruption or suspension of the time limitation occurred and that the commencement of trial [was] timely." *Joseph*, 2018-0867, p. 6, 363 So.3d at 315.

On January 13, 2021, Ms. White filed an Omnibus Motion to Suppress Evidence and Statements, which is one of the "[p]reliminary pleas that suspend the running of the prescriptive period under [La. C.Cr.P.] art[.] 580," and which the district court did not rule on until June 21, 2022, pushing back the commencement of trial deadline to June 21, 2023. *Brazile*, 2006-1611, p. 3, 960 So.2d at 335. Subsequently, on November 22, 2022, Ms. White filed her First Motion to Quash, which suspended the running of the prescriptive period per La. C.Cr.P. art. 580, and the district court ruled on it on December 8, 2022, thereby moving the deadline for the commencement of trial back again to December 8, 2023. Then, on April 18, 2023, Ms. White filed a motion to continue; and, per *Brazile*, a defense motion to continue suspends the prescriptive period found in La. C.Cr.P. art. 578(A)(2).

38

Before the district court even ruled on Ms. White's motion to continue, however, on May 1, 2023, the parties jointly moved to continue the trial. As noted above, *Brazile* lists a joint motion for continuance as a type of preliminary plea that suspends the running of the prescription period in La. C.Cr.P. art. 578(A)(2), such that this May 1, 2023 motion by Ms. White and the State again delayed the deadline to commence trial. The record reflects the district court granted the joint motion for continuance that same day, such that the State had until one year after that ruling, i.e., until May 1, 2024, to commence Ms. White's trial according to La. C.Cr.P. art. 580. In April 2024, Ms. White filed her Second Motion to Quash, and the district court denied it on April 26, 2024, thereby pushing back the deadline to commence trial yet again (to April 26, 2025). Therefore, when Ms. White's trial began on April 29, 2024, prior to that deadline, it was timely under La. C.Cr.P. arts. 578 and 580.

In sum, we find the State did not violate Ms. White's statutory right to a speedy trial either via an untimely institution of prosecution or untimely commencement of her trial. Notwithstanding the lack of a statutory violation, we must next consider whether the State violated Ms. White's constitutional rights to a speedy trial.

### Constitutional Right to a Speedy Trial

As previously stated, the Sixth Amendment to the United States Constitution and Article I, Section 16 of the Louisiana Constitution establish a defendant's constitutional right to a speedy trial. A defendant's "constitutional right to a speedy trial attaches when [that] individual becomes an accused either by formal indictment or bill of information or by arrest and actual restraint." *State v. Ellis*, 1994-1106, p. 2 (La. App. 3 Cir. 3/1/95), 651 So.2d 949, 950 (citing *State v.*

*Butler*, 615 So.2d 496 (La. App. 3d Cir. 1993)). To determine "whether a defendant's constitutional right to a speedy trial has been violated, courts consider four factors: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of his right to speedy trial; and (4) the prejudice to the defendant resulting from the delay." *Andrews*, 2018-0149, 0339, p. 8, 255 So.3d at 1113 (first citing *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192; and then citing *State v. Reaves*, 376 So.2d 126, 138 (La. 1979)). As explained by this Court in *Andrews*, "[n]one of the four *Barker* factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial," but rather "are related and must be considered together in light of the circumstances of each case." *Id.* at pp. 8-9, 255 So.3d at 1113 (quoting *State v. Love*, 2000-3347, p. 15 (La. 5/23/03), 847 So.2d 1198, 1210).

### *(1) The Length of Delay*

Though the *Barker* factors must be considered together, this Court has explained that "[t]he first [*Barker*] factor, the length of the delay, is a 'triggering mechanism' for further inquiry into the other three *Barker* factors, which need not be addressed unless the reviewing court finds the length of the delay to be presumptively prejudicial." *Id.* at p. 9, 255 So.3d at 1113 (first citing *State v. Gaines*, 2008-0967, p. 3 (La. App. 4 Cir. 2/11/09), 5 So.3d 915, 917; and then citing *State v. DeRouen*, 1996-0725, p. 3 (La. App. 4 Cir. 6/26/96), 678 So.2d 39, 40). Louisiana courts "measure the length of the delay as the time between the filing of the bill of information and . . . the motion to quash." *Id.* at p. 11, 255 So.3d at 1114 (citing *Gaines*, 2008-0967, p. 4, 5 So.3d at 918). Further, in terms of "[t]he weight ascribed to the length of the delay," this "depends on the particular circumstances of the case, such as the gravity of the charged crime and the

complexity of the case, because 'the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.'" *Id.* (quoting *Reaves*, 376 So.2d at 138). Moreover, "any time period during which the defendant is not under arrest or held to answer a criminal charge should not be used in calculating a constitutional speedy trial delay." *Id.* at p. 11, 255 So.3d at 1114 (citing *State v. Mathews*, 2013-0525, pp. 3-4 (La. 11/15/13), 129 So.3d 1217, 1219).

For example, in *Ellis*, the State charged the defendant by bill of information with aggravated rape. 1994-1106, p. 1, 651 So.2d at 949. The Louisiana Third Circuit Court of Appeal ("Third Circuit") held that the "period of almost three years . . . from the time [the defendant] was arrested until the time of trial" was "presumptively prejudicial in light of the nature of the crime and evidence needed to convict the defendant." *Id.* at pp. 2-3, 651 So.2d at 950.

Turning to the matter *sub judice*, the relevant time period in this matter is the time between the State filing the bill of information charging Ms. White with vehicular homicide (June 25, 2020) and Ms. White filing and the district court denying her Second Motion to Quash (April 2024). Prior to that time, Ms. White was "not under arrest or held to answer a criminal charge," so it is not relevant "in calculating a constitutional speedy trial delay." *Andrews*, 2018-0149, 0339, p. 11, 255 So.3d at 1114 (citing *Mathews*, 2013-0525, pp. 3-4 (La. 11/15/13), 129 So.3d 1217, 1219). We find that the time period between June 2020 and April 2024— just shy of four years—is presumptively prejudicial. As noted previously, the weight given to the length of the delay depends upon the nature of the case, including its gravity and complexity. Like in *Ellis*, the State charged Ms. White with a serious crime, vehicular homicide, not an "ordinary street crime." Because

41

the Third Circuit found the three-year delay in *Ellis* to be presumptively prejudicial for the serious, complex charge at issue therein, we likewise hold the nearly four-year delay between the State filing the bill of information concerning the serious, complex charge of vehicular homicide to be presumptively prejudicial in this matter. Accordingly, we will move onto the other *Barker* factors.

### (2) The Reason for Delay

The second *Barker* factor, the reason for the delay, requires us to "review the record to determine which party is primarily responsible for the delay in commencing trial." *Andrews*, 2018-0149, 0339, pp. 12-13, 255 So.3d at 1115. As delineated previously, after the State initiated prosecution against Ms. White by filing the bill of information charging her with vehicular homicide, the delays for the commencement of trial were, in part, the result of her own pleadings, such as her Omnibus Motion to Suppress Evidence and Statements. Additionally, Ms. White individually filed a motion to continue; jointly sought continuances with the State; and did not object to a continuance sought by the State in 2021. The State sought an additional continuance in February 2024, to which Ms. White objected. Accordingly, we find the State was not the party primarily responsible for the delay commencing Ms. White's trial. Instead, Ms. White was equally responsible for the pre-trial delays, so we find that this factor weighs against a finding that there was a violation of her constitutional right to a speedy trial.

### (3) The Defendant's Assertion of Her Right to a Speedy Trial

The third *Barker* factor concerns whether the defendant asserted her right to a speedy trial. A defendant's "failure to assert the right will make it difficult . . . to prove that [s]he was denied a speedy trial." *Andrews*, 2018-0149, 0339, p. 15, 255 So.3d at 1117 (quoting *State v. Noel*, 2013-1218, pp. 7-8 (La. App. 4 Cir. 10/1/14),

151 So.3d 706, 712). As this Court explained in *Andrews*, however, in its opinion issued in *Barker*, the United States Supreme Court "rejected a bright line rule that [the] defendant must assert his right to a speedy trial lest it be waived; instead the [c]ourt implemented a balancing test, 'in which the conduct of both the prosecution and the defendant are weighed.'" *Id.* (quoting *Barker*, 407 U.S. at 529-30, 92 S.Ct. at 2191-92). Under this balancing test, a court "weigh[s] the frequency and force of the [defendant's] objections" to the alleged untimeliness of trial. *Noel*, 2013-1218, p. 8, 151 So.3d at 712 (citations omitted). In particular, if the defendant did not assert his or her right to a speedy trial, this Court has considered whether the defendant objected to continuances sought by the State prior to filing his or her motion to quash. *Id.* The record reflects that Ms. White did not file a motion for a speedy trial. Additionally, Ms. White not only sought joint continuances with the State but also objected to only one of the two continuances sought by the State individually. In light of the foregoing, we find this factor weighs against Ms. White.

### *(4) The Prejudice to the Defendant Resulting from the Delay*

Last, the fourth *Barker* factor considers whether the delays prejudiced the defendant. "Prejudice should be assessed particularly in light of three interests that the right to speedy trial was designed to protect: to prevent oppressive pretrial incarceration; to minimize anxiety and concern of the accused; and to limit the possibility that the defense will be impaired." *Andrews*, 2018-0149, p. 16, 255 So.3d at 1117 (citing *Barker*, 407 U.S. at 532-33, 92 S.Ct. at 2193). In *Barker*, the United States Supreme Court specified that "even if an accused is not incarcerated prior to trial, [she] is still disadvantaged by restraints on [her] liberty and by living under a cloud of anxiety, suspicion, and often hostility." 407 U.S. at 532-33, 92

S.Ct. at 2193. Moreover, this Court has noted that "the impairment of a defendant's ability to prepare his defense is the most serious form of prejudice, because it 'skews the fairness of the entire system.'" *Andrews*, 2018-0149, 0339, p. 17, 255 So.3d at 1117 (quoting *Barker*, 407 U.S. at 532-33, 92 S.Ct. at 2193). However, this Court has also explained that "[a] defendant is required to raise sufficient and specific prejudice as opposed to only claims of general prejudice." *State v. Smith*, 2016-0393 (La. App. 4 Cir. 11/23/16), 204 So.3d 1035, 1039 (citing *State v. Bell*, 2013-0117 (La. 9/27/13), 122 So.3d 1007).

In this matter, Ms. White was not incarcerated pending her trial. Though her lack of incarceration is not dispositive, we further note Ms. White made little more than general and speculative claims that she was prejudiced by the delay, citing to the potential for witnesses' memories to have "faded" but made no actual showing of prejudice. Without claims of sufficient and specific prejudice, we find the fourth *Barker* factor also weighs against Ms. White.

In sum, although the delays to Ms. White's trial were presumptively prejudicial because of the duration of the delay, the other *Barker* factors do not weigh in favor of Ms. White, given that the delays were not solely the fault of the State, she did not request a speedy trial, and she presented no claims of specific prejudice. We find the State did not violate Ms. White's statutory or constitutional rights to a speedy trial by any delays in instituting the prosecution against her or the commencement of her trial. Therefore, the district court did not err in denying Ms. White's Second Motion to Quash, and her fourth assignment of error is without merit.

## Whether the District Court Erred When It Refused to Instruct the Jury Regarding the Permissible Responsive Verdict of Negligent Injuring

In her fifth assignment of error, Ms. White asserts the district court erred in denying her request for special jury instructions on the lesser offense of negligent injuring, contending it should have "be[en] included as a responsive verdict to vehicular homicide" the crime with which the State charged her. Ms. White contends the district court's "denial of instruction on a responsive verdict prejudiced [her] and prevented the jury from considering her defense." The State counters that "[t]he [district] court correctly refused to instruct the jury" regarding negligent injuring because "[i]nclusion of that verdict would have been legal error" as it is not in the "explicitly enumerated list of responsive verdicts for th[e] offense" of vehicular homicide. We agree with the State.

Louisiana Code of Criminal Procedure Article 807 provides the State and the defendant with "the right before argument to submit to the court special written charges for the jury." If the State or the defendant submits such a charge, it "shall be given by the [district] court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent." La. C.Cr.P. art. 807. If the district court refused a party's submission, on appeal, the appellate court considers whether the district court legally "erred in failing to give the special requested charges" and, if so, whether that failure resulted in "a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right" so as to "constitute[] reversible error." *State v. Leeming*, 612 So.2d 308, 315 (La. App. 5th Cir. 1992) (citing *State v. Pettaway*, 450 So.2d 1345 (La. App. 2d Cir. 1984)). Louisiana Code of Criminal Procedure Article 814 sets a list of responsive verdicts for particular charged offenses. It

45

states that "[t]he only responsive verdicts which may be rendered when the indictment charges [Vehicular Homicide] are: . . . Guilty. Guilty of negligent homicide. Not guilty." La. C.Cr.P. art. 814(A)(8). As explained by this Court, however, "[a] trial court lacks the authority to vary or add to the prescribed verdicts mandated by La. [C.Cr.P.] art. 814." *State v. Jones*, 2013-1118, p. 6 (La. App. 4 Cir. 1/30/14), 156 So.3d 126, 129 (citing *State v. Simmons*, 357 So.2d 517, 518 (La. 1978)). Therefore, "there is no requirement that a jury be informed as to non-responsive verdicts." *State v. Smith*, 43,291, p. 13 (La. App. 2 Cir. 8/13/08), 988 So.2d 861, 869. In fact, if a trial results in "[a] non-responsive verdict," then this "is an error which constitutes grounds for reversal." *Jones*, 2013-1118, p. 6, 156 So.3d at 129 (citing *State v. Thibodeaux*, 380 So.2d 59, 61 (La. 1980)).

The State charged Ms. White by bill of information with vehicular homicide. Because that is one of the offenses for which La. C.Cr.P. art. 814 delineates the responsive verdicts, namely guilty, guilty of negligent homicide, and not guilty, the district court would have been in error to grant Ms. White's request and to instruct the jury regarding anything other than those responsive verdicts. Accordingly, we find the district court correctly denied Ms. White's request to instruct the jury about negligent injuring because it is not a responsive verdict for the offence of vehicular homicide. Ms. White's fifth assignment of error is without merit.

### Whether the District Court Erred in Permitting Hearsay Evidence that Violated the Confrontation Clause, and If So, Whether that Error was Harmless

In her sixth and final assignment of error, Ms. White asserts "[t]he district court erred in allowing the State to use hearsay evidence under the non-existent 'investigation' exception," in violation of her "right to confrontation and cross examination of the witnesses against her." Specifically, Ms. White refers in her

brief to this Court to testimony provided by Sergeant Johnson concerning Mr. Scott's "whereabouts and activity at the time of the accident," despite Sergeant Johnson also testifying that he himself did not speak to Mr. Scott. Additionally, Ms. White notes the State questioned Sergeant Johnson regarding the written statement provided by a non-testifying witness, Mr. Mulvaney, who spoke with Sergeant Johnson at the scene. According to Ms. White, the district court permitted Sergeant Johnson to testify about Mr. Mulvaney's and other officers' descriptions of her driving at the time of the accident and her condition following the accident. Finally, Ms. White objected to testimony provided by Detective Baldassaro, whereby, he testified that in the course of his investigation he learned from witness statements that Ms. White was driving in a "reckless manner" which he described as "high speeding, back and forth, [and driving] in and out of traffic."

The trial transcript establishes counsel for Ms. White objected to this testimony during trial, thereby preserving the issue for appellate review,[15] but the district court denied the objection on the basis that "an officer is allowed to testify as to what he learned during the course and scope of his investigation." Regarding Ms. White's allegation that this testimony constitutes hearsay, the State similarly counters there is a jurisprudential "doctrine" that permits such testimony "when the statements are used not to establish the defendant's guilt, but to explain the course of the police investigation." Turning to Ms. White's Confrontation Clause argument, the State notes the United States Fifth Circuit Court of Appeals has held

---

[15] Louisiana Code of Criminal Procedure Article 841(A) states that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." As this Court recently explained regarding La. C.C.P. art. 841(A), "Without a contemporaneous objection at trial, the appellate court will not consider an assignment of error, raised for the first time on appeal." *State v. Blue*, 2024-0737, p. 13 (La. App. 4 Cir. 8/21/25), ___ So.3d ___, ___, 2025 WL 2416819, at *6 (quoting *State v. Trung Le*, 2017-0164, p. 18 (La. App. 4 Cir. 4/11/18), 243 So.3d 637, 656).

47

"[o]fficers can sometimes provide background information to explain the[ir] actions without introducing hearsay." In support, the State cites to *United States v. Hamann*, 33 F.4th 759, 769 (5th Cir. 2022) (citing *United States v. Carrillo*, 20 F.3d 617, 619 (5th Cir. 1994)).

As provided by the Confrontation Clause of the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend. 6. Specifically, the provision prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had [] a prior opportunity for cross-examination." *State v. Horton*, 2024-0458, p. 21 (La. App. 4 Cir. 7/24/25), ___ So.3d ___, ___, 2025 WL 2080548, *10 (alteration in original) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004)). "Only testimonial statements are subject to the Confrontation Clause." *Id.* (citing *State v. Magee*, 2012-1025, p. 23 (La. App. 4 Cir. 5/22/13), 116 So.3d 948, 962). This is because "[t]he main and essential purpose of confrontation is to secure the opportunity of cross examination." *State v. Stewart*, 2024-0454, p. 21 (La. App. 4 Cir. 5/14/25), ___, So.3d ___, ___, 2025 WL 1414856, *10 (citing *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)). Additionally, La. C.E. art. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." As established in La. C.E. art. 802, "[h]earsay is not admissible except as otherwise provided by this Code or other legislation." The reviewing court will not reverse a district court's ruling on the admissibility of evidence alleged to be hearsay absent an abuse of discretion. *State in Int. of K.B.,*

2023-0409, pp. 31-32 (La. App. 4 Cir. 9/26/23), 372 So.3d 864, 885 (citing *State v. Clanton*, 2019-0316, p. 8 (La. App. 4 Cir. 11/6/19), 285 So.3d 31, 37).

Jurisprudentially, this Court has held that "hearsay rules do not prohibit testimony elicited to explain an officer's course of investigation." *State v. Edwards*, 2021-0494, p. 18 (La. App. 4 Cir. 2/16/22), 336 So.3d 479, 490. Specifically, "[a] police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case. Such statements are admitted not to prove the truth of the assertion, but to explain the sequence of events leading to the arrest of the defendant from the view point of the investigating officer." *State in Int. of K.B.,* 2023-0409, p. 32, 372 So.3d at 885 (quoting *State v. Keelen*, 1995-0668, p. 6 (La. App. 4 Cir. 2/29/96), 670 So.2d 578, 582). *See also Clanton*, 2019-0316, p. 8, 285 So.3d at 37 (stating "[t]he testimony of a police officer may encompass information provided by another individual without constituting hearsay, if it is offered to explain the course of the police investigation and the steps leading to the defendant's arrest" (alteration in original) (quoting *State v. Randolph*, 2016-0892, p. 11 (La. App. 4 Cir. 5/3/17), 219 So.3d 425, 433)).

Moreover, "[i]t is well established that the admission of hearsay and an alleged confrontation clause violation are subject to [a] harmless error analysis." *State v. Shorts*, 2023-0771, p. 11 (La. App. 4 Cir. 5/8/25), ___ So.3d ___, ___, 2025 WL 1341537, *5 (first citing *State v. Wille*, 559 So.2d 1321, 1332 (La. 1990); then citing *Edwards*, 2021-0494, p. 18, 336 So.3d at 490; and then citing *State v. Hart*, 2010-1614, p. 5 (La. App. 4 Cir. 11/2/11), 80 So.3d 25, 30). As this Court has explained, "[t]he test for determining harmless error is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, i.e., was the

49

guilty verdict actually rendered unattributable to the error." *Id*. (quoting *State v. Hugle*, 2011-1121, p. 28 (La. App. 4 Cir. 11/7/12), 104 So.3d 598, 618). In conducting "a harmless error analysis, factors to consider include the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of corroborating evidence, the extent of cross-examination permitted, and [the] overall strength of the [S]tate's case." *Edwards*, 2021-0494, p.18, 336 So.3d at 490 (citing *Wille*, 559 So.2d at 1332). The reviewing court must consider whether, "assuming that the damaging potential of the cross-examination were fully realized, [it] is nonetheless convinced that the error was harmless beyond a reasonable doubt." *State v. Hart*, 2010-1614 (La. App. 4 Cir. 11/2/11), 80 So.3d 25, 30 (quoting *Wille*, 559 So.2d at 1332).

Turning to the matter *sub judice*, we find Sergeant Johnson's and Detective Baldassaro's testimony explained the course of their investigations of the accident and their steps which led to charging Ms. White in connection with the subject accident. Sergeant Johnson was asked to explain the steps he took in performing his initial investigation on the scene. He explained that his responsibilities included handling the on-scene investigation by "talking to people, getting statements, and towing the vehicle." When asked how he learned of Mr. Scott's location and condition, Sergeant Johnson explained that although he did not speak with Mr. Scott, he learned from Mr. Scott's relatives that Mr. Scott had been standing on stairs leading to a balcony attached to the rear of one of the residences whose backyard Ms. White traveled through. Sergeant Johnson further testified that in taking witness statements on the scene, he "learned" that Ms. White "was observed driving erratically at a high rate of speed, cutting in and out of traffic" and was "driving crazy." Additionally, Detective Baldassaro was asked to explain "without

saying specifically what any particular witness said" what he learned through his investigation of Ms. White's driving. He testified that in the course of his investigation he learned from witness statements that Ms. White was driving in a "reckless manner" which he described as "high speeding, back and forth, [and driving] in and out of traffic." Detective Baldassaro explained that he took the description of Ms. White's driving into consideration in determining to charge her which vehicular homicide. Accordingly, these statements were made in explaining the course of the officers' investigations and what led to Ms. White's arrest, which involved gathering information about the accident by speaking to the witnesses at the scene.

Moreover, even if the district court had erred and we found that Sergeant Johnson's and Detective Baldassaro's respective testimonies constituted hearsay, this nevertheless amounted to harmless error, particularly because these statements were cumulative, corroborated by the testimony of other witnesses, or unimportant to the outcome. First, Sergeant Johnson's testimony as to Mr. Scott's position prior to the accident was harmless because it was undisputed that Mr. Scott fell when Ms. White crashed into the stairs leading to the balcony on which he was standing. Ms. White herself also testified to "feeling terrible" about Mr. Scott's injuries and does not dispute that he was injured by the accident. Second, Mr. Sherlock testified on behalf of the State regarding his own personal observations witnessing Ms. White's erratic driving. Specifically, Mr. Sherlock described how he and another driver had to swerve and slam on their breaks because they were "almost hit" by Ms. White who, while attempting to enter the interstate, drove past him on the shoulder at a high rate of speed and "shot the bird" at another driver she was trying to get in front of, before her car was flung off of the roadway by a guardrail. Third,

Detectives Ellis and Baldassaro testified that they smelled alcohol on Ms. White's breath both at the scene and shortly after she was removed from the scene. Chemical breathalyzer testing performed by Detective Baldassaro shortly after the accident confirmed that Ms. White was legally "drunk" during the incident. Furthermore, Ms. White had the opportunity to and did cross-examine all of the witnesses who testified at trial. Therefore, Sergeant Johnson's testimony regarding the non-testifying witness he spoke to on the scene and Detective Baldassaro's testimony regarding what he learned about Ms. White's driving constituted harmless error because other witnesses who testified and were subject to cross-examination at trial corroborated this information. Accordingly, we find that the guilty verdict rendered was unattributable to the statements made by Sergeant Johnson and Detective Baldassaro which Ms. White alleged were hearsay. Thus, even if we had found these statements to be hearsay, Ms. White's assignment of error would nonetheless lack merit because any error in the admission of same was a harmless one.

## CONCLUSION

For the foregoing reasons, we affirm Ms. White's conviction and sentence for negligent homicide.

**AFFIRMED**